332 S.E.2d 831

**Phyllis J. RUTLEDGE, etc.**

v.

**Margaret WORKMAN, Judge, etc.**

**No. 16582.**

Supreme Court of Appeals of West Virginia.

Submitted April 23, 1985.

Decided July 10, 1985.

---

Michael R. Cline, Charleston, for petitioner.

Allan H. Masinter, Lewis, Ciccarello, Masinter & Friedberg, Charleston, for respondent.

NEELY, Chief Justice:

The issues presented by this case concern the role of the Clerk of the West Virginia Circuit Court, the proper exercise of the Court's jurisdiction and administrative authority, and the inherent dignity of the circuit court itself. The petitioner, Phyllis J. Rutledge, is the Clerk of the Circuit Court of Kanawha County and the respondent, Margaret Workman, is a Judge of that Circuit Court.

This novel prohibition proceeding arose when Judge Margaret Workman entered an order prohibiting the transfer of Ms. DeeAnn Hill, one of Mrs. Rutledge's Deputy Circuit Clerk's, out of Judge Workman's court to other duties. Judge Workman's order was then ratified by an order of the Chief Circuit Judge, A. Andrew MacQueen. Although Mrs. Rutledge admits that *W. Va. Code* 6–3–1(a)(1) [1971] requires Court ap-

proval before she may hire personnel initially, she asks us to vindicate her position that she has absolute, complete, and unfettered discretion to fire, assign, and reassign personnel in the office of the circuit clerk.

The record before us consists of depositions of Chief Judge A. Andrew MacQueen, Mrs. Rutledge, Deputy Clerk DeeAnn Hill, and Judge Workman's verified answer to the petition. From these documents we glean that the Circuit Court of Kanawha County and the office of its circuit clerk is a daily battleground for sordid, unnecessary, and debilitating political in-fighting. This particularly concerns us because Kanawha County has a population of roughly 231,414 inhabitants, is the seat of State government, is the largest county in the State, and is the residence of most state officials. Accordingly its court is crowded with important government matters arising in mandamus, prohibition or certiorari, and appeals from administrative agencies.

Kanawha County has seven circuit judges who run initially at-large in party primary elections and then run again at-large in general elections. The judges have eight-year terms and the clerk of the circuit court, who is also nominated and elected in partisan elections, has a six-year term. This selection process for judges and clerks thrusts the court system, albeit much to the court system's chagrin, into the daily give and take of both party politics and factional politics.

The Governor appointed Judge Margaret Workman to office in November, 1981 and at that time Mrs. Rutledge was already the elected circuit court clerk. During the first months of her tenure, Judge Workman labored without the benefit of a courtroom clerk until March 1982 when Mrs. Rutledge assigned Mrs. Iris Brisendine. Mrs. Brisendine performed capably and to Judge Workman's complete satisfaction. After a year, however, Mrs. Rutledge re-assigned Mrs. Brisendine to the court of Judge Robert K. Smith and assigned Ms. Louise Owenby, who had been Judge Smith's clerk, to Judge Workman. Both Judge Workman and Judge Smith objected in writing to this

exchange of clerks, but Mrs. Rutledge ignored their request for cooperation. In her deposition, Mrs. Rutledge acknowledged that Ms. Owenby was "not a good courtroom clerk," but Mrs. Rutledge made no attempt to discharge Ms. Owenby or to reassign her to other duties. Nonetheless, Judge Workman worked with Ms. Owenby and after awhile found her courtroom work acceptable.

Chief Judge MacQueen testified that he attempted to intercede at the time Mrs. Rutledge transferred Mrs. Brisendine and replaced her with Ms. Owenby, but that Mrs. Rutledge refused to reconsider the matter. Furthermore, according to Judge MacQueen, Mrs. Rutledge's reason for making the transfer was that Ms. Brisendine's loyalties were being transferred to Judge Workman and it was necessary for Mrs. Rutledge to re-establish "who was boss."

In February 1984, Mrs. Rutledge transferred Ms. Owenby from Judge Workman's court and replaced her with Ms. Jacqueline Ray. Judge Workman soon discharged Ms. Ray for rank insubordination and disrespect to the judge in the presence of others. Nevertheless, three days later Mrs. Rutledge re-employed Ms. Ray as a staff assistant without any serious inquiry into the circumstances surrounding Ms. Ray's dismissal by Judge Workman.

After Judge Workman had Ms. Ray removed as an officer of her court, there was a period between February and May 1984, during which Judge Workman was without a regularly assigned courtroom clerk. Because she often was forced to work with more than one clerk during the course of a single judicial day, Judge Workman repeatedly asked Mrs. Rutledge's administrative assistant to assign a deputy clerk to her court on a permanent basis. Finally in May, 1984, Ms. DeeAnn Hill was assigned to Judge Workman.

In November 1984, however, Mrs. Rutledge notified the judges that she would transfer various courtroom clerks, including Ms. Hill. Upon receiving that notice, Judge Workman entered her order prohibiting the transfer of Ms. Hill without the

court's approval, and the record clearly shows that from the point of view of proper judicial administration, the order was more than justified. Not only was Judge Workman's efficiency impaired by the assignment of incompetent clerks to her court, and the transfer of competent clerks out of her court, but also on many occasions her court's efficiency was impaired by the absence of any clerks whatsoever.

Other events add credence to Judge Workman's side of the case. Judge Mac-Queen testified that Mrs. Rutledge transferred Ms. Micky Amick, Judge Mac-Queens' courtroom clerk, and replaced her with Mr. Joseph Schirrman, Mrs. Rutledge's son-in-law. Judge MacQueen described Ms. Amick as "probably the best clerk I have ever had ... because of her proficiency, her willingness to learn, ... and her ability to work together with me, with my secretary, my bailiff, and my court reporter." According to Judge MacQueen, the performance of Mrs. Rutledge's son-in-law has been less than stellar.

■ The record in this case is replete with accusations, counter-accusations, and other billingsgate concerning the relation of personnel decisions in the circuit clerk's office to factional politics in Kanawha County. None of that information, however, is relevant to the disposition of this case. We are asked only to decide today whether the clerk of a circuit court is part of that court and subject to the direction of the chief circuit judge, or, on the contrary, whether the clerk is an independent, elected official with unbridled discretion over the administration of her office. The respective merits of political positions in a county have no bearing on a principled resolution of that issue. We find that the law on this subject is clear: the circuit clerk, although elected by the voters, is completely subject to the control of the chief circuit judge of the circuit court and failure to follow to the letter and in the utmost good faith the direction of the judge or chief circuit judge is grounds for removal from office. Furthermore, a circuit judge has complete control of the deputy circuit clerk assigned to her court.

I

As this case presents a question of first impression, there is only a small corpus of case law to guide our decision. But this is not to say that we are without instruction. The structure of our judiciary, as prescribed by the *Constitution of the State of West Virginia,* provides us with both a compass and a command.

The paucity of authority on the subject in this jurisdiction is related to the fact that the problem was unlikely to have arisen before the Judicial Reorganization Amendment of 1974 that rewrote our *Constitution's* judicial article. Before 1974 there was but one circuit judge in each of West Virginia's fifty-five counties, and that allowed for little confusion about who was in charge of the court system. *W.Va. Const.* art. VIII, §§ 10–15 (1880, amended 1974). A circuit clerk ignored the directions of the circuit judge at considerable peril. In some counties the legislature had, indeed, created inferior courts such as criminal courts, domestic relations courts, or common pleas courts, but the supreme judicial power within the county was held by one elected circuit court judge who was responsible for initial appellate review of the decisions of all statutory courts and controlled the judges of inferior courts through writs of prohibition and mandamus. *W.Va. Const.* art. VIII, § 12 (1880, amended 1974). *See also State v. Mulane,* 128 W.Va. 774, 38 S.E.2d 343 (1946) (circuit courts have exclusive jurisdiction to review judgments of courts of limited jurisdiction).

The ratification of the Judicial Reorganization Amendment in 1974 converted all of the intermediate, statutory courts into circuit courts and thus created today's system where one circuit court bench may have as many as seven judges with equal authority. This situation, in turn, made it necessary to create the position of chief circuit judge in multi-judge counties, and that position is filled by election among the circuit judges or, in the event that there is a tie vote, through designation by the Supreme Court of Appeals.

The 1974 Judicial Reorganization Amendment did more than establish a hierarchy among the circuit judges, however. It centralized the administrative power of the entire judicial system and reposed this power in the hands of the Supreme Court of Appeals. The 1974 Judicial Reorganization Amendment patterned our judicial system after the "unitary" system pioneered by New Jersey.[1] The rulemaking power these plans give to their supreme courts in effect make the Chief Justice the administrative head of all courts.[2] The Supreme Court's exclusive authority over administration, and primary responsibility for establishing rules of practice and procedure, secures businesslike management for the courts and promotes simplified and more economical judicial procedures. Given the similar structure of the West Virginia and New Jersey courts, the New Jersey judicial administration experiences are particularly relevant to the problem at hand.

Both the New Jersey and West Virginia courts have faced the problems of insuring that these new "unitary" court systems are also effective court systems. Nowhere have these problems been more apparent than where the courts have had to exercise their new administrative powers to perform their non-judicial duties such as setting their budget or the appointment, transfer or dismissal of court personnel. In these instances, the courts have routinely vindicated their constitutional mandate to exercise the inherent power to administer the court system. *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 246 S.E.2d 99 (1978); (the judiciary has the inherent power to determine what funds are necessary for its efficient operation). *Re 1978 Passaic County Budget Relating to Juvenile & Domestic Relations Court*, 165 N.J.Super. 598, 398 A.2d 1295 (App.Div.1979) (assignment judge has inherent power to impose on county responsibility for funding juvenile and domestic relations services be-

cause program is an integral part of justice system); *In re Brennan*, 126 N.J.Super. 368, 314 A.2d 610 (App.Div.1974) (power to terminate employment of county clerk of court is part of Supreme Court's power to administer court system); *See generally* Annot., 59 A.L.R.2d 548 (1974). We face a similar problem here. As our first duty is to insure the fair and effective dispensation of justice, we hold that the circuit judges retain control over their clerks.

The New Jersey courts have decided cases on this subject and their reasoning is persuasive. The county clerk is the New Jersey equivalent of the West Virginia circuit court clerk.[3] Because these clerks are elected, they have a hybrid status—half county official: half judicial officer. Nevertheless, these clerks are fully answerable to the judicial system. When a conflict arose between the assignment judge, the chief administrator of New Jersey's county judicial system, and county officials, the court upheld the judge's constitutional power to administer the judiciary. The court stated:

The power of the assignment judge to select and assign as his assistants those who satisfy his needs from the coterie of county employees stems from the inherent power of the courts as implemented by R. 1:33–3(b). And although these assistants may remain county employees for the purpose of payment of their remuneration, they nevertheless serve under the control and direction of the assignment judge in the unclassified category and at his pleasure.

*Matter of Court Reorganization Plan; etc.*, 161 N.J.Super. 483, 391 A.2d 1255, 1260 (App.Div.1978) *aff'd o.b.* 78 N.J. 498, 396 A.2d 1144 (1979). And since this power to regulate the conduct of the courts is constitutional, it transcends any legislative directives. 161 N.J.Super. 483, 391 A.2d at 1260. In the same manner, the *West Virginia Constitution* mandates that we, and

---

**1.** A comparison between *W.Va. Const.* art. VIII, 1 *et seq.; N.J. Const.* art. VI, § 1 *et seq.,* and *W.Va. Const.* art. VIII, § 1 *et seq.,* (1880, amended 1974), brings the differences between the new "unitary" systems and our old judicial hierarchy into high relief.

**2.** *W.Va. Const.* art. VIII, § 3; *N.J. Const.* art. VI, § 2, ¶ 3; art. VI, § 7, ¶ 1, 2.

**3.** *Compare N.J. Const.* art. VII, § 2, ¶ 2, *with W.Va. Const.* art. VIII, § 9.

the circuit court judges administer the judicial system with dispatch. Although the circuit court clerks are more than our minions, the constitution's mandate for effective justice guides their action as well as ours. They must aid the administration of justice or face censure.

Furthermore, it is beyond doubt that the role and authority of circuit court clerk must be analyzed within the framework of the judicial system. *W.Va. Const.* art. VIII, § 9 establishes the office of the clerk of circuit court.[4] Unlike *all* other county officials, the office of circuit clerk is created under *W.Va. Const.* art. VIII, (the judicial article), and not under *W.Va. Const.* art. IX that creates elected county officials with executive and legislative duties, including the prosecuting attorney, sheriff, assessor, county commission, and clerk of the county commission.

## II

Unfortunately, although our constitutional mandate is clear, neither legislative enactment nor specific constitutional provision explicitly address the issue of: "To what extent is a circuit clerk responsible to the circuit court." The only specific legislation is *W.Va.Code* 6–3–1(a)(1) [1971] which provides as follows:

> The clerk of the supreme court of appeals, or of any circuit, criminal, common pleas, intermediate or county court, or of any tribunal established by law in lieu thereof, may, *with the consent of the court*, or such tribunal, duly entered of record, appoint any person or persons his deputy or deputies. [Emphasis added]

Obviously, that statute explicitly contemplates that a judge cannot have incompetent, obstreperous, scandalous, or uncooperative personnel thrust upon her and, by implication, it also means that if deputy circuit clerks do not perform in a satisfactory fashion, the judge may have them discharged. Furthermore, although a circuit clerk has duties that are unrelated to the day-to-day operation of the circuit court[5] *Code* 6–3–1(a)(1) [1971] requires circuit court approval for the hiring of any personnel who have the statutory powers of deputy clerks.

## III

In her deposition Mrs. Rutledge opined as follows: "I don't see the office of circuit clerk as a handmaiden to the court...." Unfortunately for Mrs. Rutledge *W.Va. Const.* art. VIII § 1 is explicit in its placement of all judicial power in the Supreme Court of Appeals and the circuit courts, which means, in effect, that the circuit clerk is an integral part of the circuit court. Both the wording of *W.Va. Const.* art. VIII, § 1 and the structure of the entire judicial article (Article VIII) are clear in that they establish a centralized state judiciary.

Mrs. Rutledge argues that her position as an independently elected, constitutional officer clothes her with discretion and authority independent of the will and pleasure of the circuit court. We, however, find no conflict between the election process that selects Mrs. Rutledge from among competing candidates for the job of circuit clerk and a requirement that after being so selected she serve within the hierarchy of judicial authority. An analogous situation

---

4. *W.Va. Const.* art. VIII, § 9 provides that:

   The voters of each county shall elect a clerk of the circuit court, whose term of office shall be six years; his duties, responsibilities, compensation and the manner of removing him from office shall be prescribed by law. Whenever the clerk shall be so situated as to make it improper for him to act in any matter, a clerk to act therein shall be appointed by the judge of the circuit court or the chief judge thereof, if there be more than one judge of the circuit court. Vacancies shall be filled in the manner prescribed by law. A clerk of the circuit court in office on the effective date

of this article shall continue in office until his term shall expire, unless sooner removed in the manner prescribed by law.

5. Clerks and deputy clerks have several nonjudicial or ministerial duties. In particular they play a large role in the administration of elections; their duties include: certification of each party's nominations, *W.Va.Code* 3–5–23 [1963]; the publication of each party's nominations, *W.Va.Code* 3–6–3 [1967]; the collection of filing fees from the candidates, *W.Va.Code* 3–5–8 [1980]; and the selection of ballot commissioners, *W.Va.Code* 3–1–19 [1968].

 

occurs in the military with regard to its commissioned officers: all military officers are commissioned by the President of the United States. Thus a major in the army receives his position from the same source as a general—presidential appointment. No one, however, would argue that when a major enters a general's command he is not absolutely bound to carry out the general's lawful orders. Accordingly, we hold today that by the inclusion of the office of circuit clerk in our Constitution's judicial article, the framers of that article intended to place the circuit clerk within the administrative hierarchy of the judicial system.

Under *W.Va. Const.* art. VIII administrative direction of the affairs of all of the circuit courts, magistrate courts, and such other courts as the legislature may from time-to-time create is placed in the Supreme Court of Appeals. At the county level, except to the extent that the circuit courts are given explicit direction by the Supreme Court of Appeals, the power to control the local affairs of the circuit is placed in the circuit judge or the chief circuit judge. It is entirely contrary to the centralized, hierarchical, and well organized structure of the state judiciary as set forth in *W.Va. Const.* art. VIII for the circuit clerk to be a loose cannon sliding around on the county's judicial deck.

The clerk of a circuit court of this State is subject to the overall administrative control and direction of the West Virginia Supreme Court of Appeals through the Chief Justice and the Administrative Director of the Supreme Court of Appeals and, thereafter, is subject to the day-to-day supervision of the Chief Circuit Judge of the circuit in which the clerk serves. Furthermore, the circuit clerk has an obligation of the utmost good faith in her dealings with *all* judges of a circuit court, and any decision to hire, fire, promote, demote, or transfer any and all personnel in the office of the circuit clerk that have any responsibility whatsoever within the judicial system must be made with that obligation firmly in mind. A circuit clerk who fails to live up to this obligation may be removed from office pursuant to *W.Va.*

*Code* 6–6–7 [1923]. When there is conflict among or between judges of a circuit court concerning the proper way for a circuit clerk to dispatch her duties, the judgment and discretion of the chief circuit judge controls.

Therefore, for the reasons set forth above, the rule to show cause in prohibition heretofore issued is discharged and the writ of prohibition for which the petitioner prays is denied.

Writ denied.