490 S.E.2d 891

**STATE of West Virginia ex rel. Gordon LAMBERT, President, County Commission of McDowell County, and Donald L. Hicks, Sheriff of McDowell County, Relators,**

v.

**Honorable Booker T. STEPHENS, Judge of the Circuit Court of McDowell County, and William Bowman, Administrator, McDowell County Jail, Respondents.**

No. 23931.

Supreme Court of Appeals of West Virginia.

Submitted March 25, 1997.

Decided July 17, 1997.

---

**19.** Those witnesses were Dr. Boyer, Dr. Schreib-

er, Professor Schie, and Dr. Seymour.

Sidney H. Bell, Prosecuting Attorney, of McDowell County Welch, for Relators.

John M. Hedges, Byrne & Hedges, Morgantown, for Booker T. Stephens, Judge.

WORKMAN, Chief Justice:

This original habeas corpus proceeding was brought to this Court on January 3, 1997, seeking the immediate custodial release of Gordon Lambert, President of the County Commission of McDowell County, and Donald L. Hicks, Sheriff of McDowell County (hereinafter collectively referred to as Relators). On that same day, this Court issued a writ of habeas corpus ad subjiciendum, commanding William Bowman, Administrator of the McDowell County Jail, to release said Relators pending further order of this Court. We also ordered the Honorable Booker T. Stephens, Chief Judge of the Circuit Court of McDowell County (hereinafter the Respondent Judge), to file a written response with this Court by January 7, 1997, together with a copy of the order sentencing Relators to thirty days in jail for contempt of court. Thereafter, by order dated January 8, 1997, this Court set a rule to show cause hearing to be held on March 25, 1997. Upon review of the facts of this case, we find it unnecessary to issue a writ of habeas corpus as Relators have purged themselves of any contempt.

## I.

### FACTS

The facts which give rise to this proceeding involve a dispute over a parking area, consisting of eight parking spaces, situated behind the magistrate court building in the City of Welch, McDowell County.[1] On December 18, 1996, the Respondent Judge is-

---

1. During oral argument, it was asserted that the parking area actually extends beyond the magis- trate court building.

sued a "General Order," designating the parking area solely for magistrate court personnel use. In this order, the Respondent Judge found the parking area was paid for by the McDowell County Commission (hereinafter Commission) out of the magistrate court fund.[2] The Respondent Judge further warned that violators of the order would face contempt proceedings.

On January 2, 1997, the Commission met to discuss the magistrate court parking situation and the Respondent Judge's order. According to the Respondent Judge, who attended this meeting, the commissioners voted unanimously to authorize Sidney Bell, Prosecuting Attorney of McDowell County, to file a petition for a writ of prohibition challenging the parking order. The very next day, however, before a petition could be filed, construction began on a ramp to provide the disabled access to the sheriff's office. The sheriff's office was located in a building next to the magistrate court building, and the ramp was being built adjacent to the magistrate court parking area. The Respondent Judge was notified of the construction and went to the construction site.

Upon arrival, the Respondent Judge was informed by Sheriff Hicks of his plan to build the ramp. After viewing the proposed design and the location of the ramp, the Respondent Judge apparently concluded that use of one of the parking spaces at issue would render the ramp inaccessible. Consequently, the Respondent Judge told Sheriff Hicks to appear before him at 1:30 p.m. that day. After the Respondent Judge left, Robert Estep, a maintenance worker employed by the Commission, arrived at the site with materials needed to build the ramp.[3] After learning of Mr. Estep's arrival at the site, the Respondent Judge apparently believed that construction of the ramp had not ceased,

and, therefore, he expedited a hearing to be held at 11:30 that morning.

Relators, along with Mr. Bell and Mr. Estep, attended the hearing.[4] At the beginning of the hearing the Respondent Judge stated he requested Sheriff Hicks and Mr. Estep to appear before the court and "show cause why they should not be held in violation of ... [the December 18, 1996] order." Mr. Estep testified that he was instructed by Sheriff Hicks and "B. G. Smith," who was instructed by President Lambert, to build the ramp up to the edge of the parking lot. Mr. Estep further testified that: (1) the ramp would not be built on the parking lot, but he believed access to the ramp would be blocked if an automobile was parked in the space closest to the ramp; (2) he did not know much about the contents of the circuit court's prior order and merely was doing what he was told to do; and (3) the only construction performed thus far was that he knocked down and dug out a cement curb at the edge of the parking lot and he got some materials to build the ramp.

President Lambert testified at the hearing that he authorized the construction of the ramp, but that he was not at the site when the construction began. During his testimony, he repeatedly stated he did not know the ramp would interfere with the magistrate court parking and was unaware his authorization of the ramp would be viewed as contemptuous of the prior order. Sheriff Hicks testified he believed the ramp would be accessible to a wheelchair even if a vehicle was in the parking space in controversy and he did not believe he was in contempt of the prior order.

At the conclusion of the hearing, the Respondent Judge orally pronounced President Lambert and Sheriff Hicks to be in "criminal contempt" and sentenced Relators to thirty days in jail.[5] The Respondent Judge added, however, that Relators could purge them-

---

2. The Commission has rented the area from the City of Welch since approximately 1984. The area provides parking to magistrates and their assistants.

3. Mr. Estep apparently was away from the site when the Respondent Judge was there and ordered Sheriff Hicks to appear before him.

4. Frieda Meade, the secretary for the Commission, also appeared at the hearing with a copy of the "minutes" of the Commission meeting held on January 2, 1997. Mr. Bell objected to the admission of these minutes into evidence.

5. Immediately thereafter, Relators were taken to jail. The written order of contempt was not entered until January 6, 1997.

selves of the contempt by restoring the disturbed area. Mr. Bell's objections and exceptions to the Respondent Judge's decision were noted in the record.

Relators maintain the area was restored that afternoon, but the Respondent Judge could not be located, necessitating the filing of the habeas corpus petition with this Court. On January 6, 1997, Relators filed a motion with the Respondent Judge asking him to purge them of the contempt. At oral argument before this Court, both parties agreed that the area in controversy was restored and, consequently, the contempt charges against Relators were purged. Consequently, we find the parties' arguments with respect to the alleged procedural deficiencies in the manner in which the Respondent Judge handled the contempt action are moot.[6] Nevertheless, there are two significant issues capable of recurrence which merit discussion by this Court. These issues center around (1) the fundamental confusion between the concepts of criminal versus civil contempt and (2) the scope of a court's authority to require reasonable and necessary resources for the performance of its responsibilities.

## II.

## DISCUSSION

### A.

### Criminal v. Civil Contempt

Confusion often arises between criminal and civil contempt.[7] In the present case, while the circuit court stated it was holding Relators in "criminal contempt" of its order, the circuit court actually imposed a civil contempt sanction. To explain the difference between the two concepts, we briefly reiterate the principles we set forth in *State ex rel. Robinson v. Michael,* 166 W.Va. 660, 276 S.E.2d 812 (1981), where we succinctly summarized the law of contempt.

In *Robinson,* we stated that we do not look at the contemptuous conduct to determine whether the contempt should be considered criminal or civil, because either type of contempt may be justified upon the same conduct. Rather, we said the classification of the contempt and the type of sanction imposed depend upon what purpose is being served by the sanction. If the purpose of imposing the sanction is to compel the contemner to comply with a court order to benefit the party bringing the contempt action, it is civil contempt. However, if the purpose of imposing the sanction "is to punish the contemner for an affront to the dignity or authority of the court, or to preserve or restore order in the court or respect for the court, the contempt is criminal." Syl. Pts. 1, 2, and 4, *Robinson.*

We further held in *Robinson* that, in civil contempt cases, an appropriate sanction is an order sentencing the contemner for an indefinite period of incarceration and specifying a reasonable way the contemner may purge the contempt in order to obtain his or her immediate release. Syl. Pt. 3, *Robinson.* Another appropriate sanction in civil contempt cases is an order requiring the contemner to pay a fine as a form of compensation or damages to the party aggrieved by the contemptuous conduct. *Id.* On the other hand, an appropriate sanction for criminal contempt "is an order sentencing the contemner to a definite term of imprisonment or an order requiring the contemner to pay a fine

---

6. This case was styled as a petition for a writ of habeas corpus and sought only a stay of the order committing Relators to jail and their immediate release. Relators also alleged certain procedural deficiencies (e.g., that they were jailed without proper notice of the hearing or of the charges against them, and that there was not an action before the circuit court which conferred jurisdiction). A petition for a writ of prohibition challenging the circuit court's authority to have entered the underlying "General Order" has never been filed with this Court. However, the parties in their memoranda of law argue the substantive issue about whether the Respondent Judge possessed the authority to is-

sue the order designating the parking spaces in the first instance.

7. Historically, even this Court has experienced difficulty in distinguishing between the concepts. *See State ex rel. Robinson v. Michael,* 166 W.Va. 660, 662–67, 276 S.E.2d 812, 814–17 (1981) (discussing the confusion surrounding the law of contempt in this Court's early cases); *Hendershot v. Hendershot,* 164 W.Va. 190, 194, 263 S.E.2d 90, 93 (1980) (recognizing the line separating criminal and civil contempt was nebulous in our older cases).

in a determined amount." Syl. Pt. 4, *Robinson.*[8]

■ After examining the order finding the Relators guilty of contempt in the present case, we find the nature of the court's action and the overall purpose of the order was more consistent with civil contempt than with criminal contempt. Although the Respondent Judge may have believed Relators' actions affronted the court's dignity and authority, the sanction imposed was primarily designed to restore compliance with the previous order regarding the parking area. As is evident of civil contempt, the contempt order specifically provided that Relators could purge themselves of the contempt by taking certain actions, i.e. by restoring the area to its original condition before construction of the ramp began. Consequently, we conclude the Respondent Judge actually found Relators guilty of civil, not criminal contempt.[9] In order to determine whether the court was in error in its civil contempt citation, we must examine the second issue.

### B.

*A Court's Inherent Authority to Require Necessary Resources*

The larger underlying issue in this case, and the one capable of repetition, centers on the extent of a court's inherent authority to require reasonable and necessary resources for the performance of its responsibilities. In the instant case, this issue focuses on the Respondent Judge's authority to enter the order designating the parking area solely for the use of magistrate court personnel. Relators contend that, pursuant to West Virginia

Code § 7-1-3s (1993), the power to control the parking area is vested with the Commission and that the Respondent Judge improperly encroached upon such power when he entered the parking order. In relevant part, West Virginia Code § 7-1-3s authorizes county commissions "to promulgate rules and regulations ... governing (1) the movement, regulation or control of vehicular or pedestrian traffic on property owned by or leased by such ... [county commissions], or (2) the regulation or control of vehicular parking on such property." W. Va.Code § 7-1-3s.

In the "General Order," the Respondent Judge recognized the area was rented from the City of Welch by the Commission. However, he also found the payments were taken from the magistrate court fund and stated he was relying upon the circuit court's inherent authority to issue the parking order "to eliminate any possibility of misunderstanding or confusion" and "to promote and insure the fair, effective, expeditious, efficient, and impartial administration of justice...." Upon review, we find the Respondent Judge had the constitutional authority to require these resources and to issue the order.

#### 1.

Specific Constitutional Provisions

In 1974, the citizens of this State ratified the Judicial Reorganization Amendment (Reorganization Amendment), which rewrote the constitutional powers and duties of our judicial branch. *See* W. Va. Const. art. VIII. The overriding purpose behind the passage of the Reorganization Amendment was to provide a unified court system in West Virgi-

---

**8.** *See also* Syl. Pt. 1, *Hendershot,* (stating "[a] contempt will be deemed criminal when a jail sentence is imposed and the contemnor is given no opportunity in the sentencing order for immediate release by purging himself of contempt by doing an act which is within his power to accomplish"); Syl. Pts. 9 and 10, in part, *Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672 (1975) (holding that civil contempt exists when a contemner may obtain his or her release by performing such act or acts as directed by the court and that criminal contempt exists when a contemner receives a definite term of imprisonment).

**9.** We recently set forth in syllabus point one of *Carter v. Carter,* 196 W.Va. 239, 470 S.E.2d 193

(1996), the standard of review we apply to civil contempt orders, which states:

> In reviewing the findings of fact and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

*Id.* As we find the contempt order in this case is now moot, we need not proceed any further in discussing the merits of the order.

nia to facilitate the prompt and efficient administration of justice. *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 634, 246 S.E.2d 99, 102 (1978).[10] To meet this purpose, the Reorganization Amendment centralized administrative authority in this Court. *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 25, 454 S.E.2d 65, 70 (1994); Syl. Pt. 1, *Carter v. Taylor*, 180 W.Va. 570, 378 S.E.2d 291 (1989);[11] *Rutledge v. Workman*, 175 W.Va. 375, 379, 332 S.E.2d 831, 835 (1985); *accord* W. Va. Const. art. VIII, § 3.[12]

The drafters of the Reorganization Amendment implicitly recognized, however, that this Court can neither make nor micro-manage every administrative decision that needs to be made at the local level. Thus, Article VIII, Section 6 of the West Virginia Constitution provides that, subject to control by this Court, a circuit court judge, or a chief circuit judge in a multi-judge circuit, is given the power to control local affairs. *See Rutledge*, 175 W.Va. at 381, 332 S.E.2d at 837; Syl. Pt. 2, *Carter v. Taylor*.[13] In addition, this section also gives the circuit court judge, or the chief judge thereof, the "general supervisory control over all magistrate courts...." W. Va. Const. art. VIII, § 6.[14]

In *State ex rel. Skinner v. Dostert*, 166 W.Va. 743, 278 S.E.2d 624 (1981), we addressed whether the Jefferson County Circuit Court possessed the authority under Article VIII, Section 6 to enter an "administrative order," sua sponte, specifying the procedural steps for dismissing warrants in magistrate court. *Id.* at 745–46, 278 S.E.2d at 627–28.[15] We recognized that, pursuant to this section a circuit court can exert its control over a magistrate court in two ways. One way is derived from the circuit court's appellate authority,[16] and the other way originates from the circuit court's general supervisory power.[17] *Id.* at 755, 278 S.E.2d at 632–33.

After determining the circuit court did not possess the power to issue the order under its appellate authority,[18] we proceeded to discuss the circuit court's general supervisory power. We found the circuit court's general supervisory power is implicitly defined in

---

10. *See also* W. Va. Const. art. III, § 17 ("The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; *and justice shall be administered without sale, denial or delay.*" (Emphasis added)).

11. Syllabus point one states: "General supervisory control over all intermediate appellate, circuit, and magistrate courts resides in the Supreme Court of Appeals. *W.Va. Const.*, art. VIII, § 3." Syl. Pt. 1, *Carter v. Taylor*.

12. In relevant part, Article VIII, Section 3 of the West Virginia Constitution provides: "The [Supreme Court of Appeals] ... shall have general supervisory control over all intermediate appellate courts, circuit courts and magistrate courts. The chief justice shall be the administrative head of all the courts."

13. This syllabus point provides: "Local administrative authority in a multi-judge circuit reposes in the chief judge thereof." Syl. Pt. 2, *Carter v. Taylor*.

14. The relevant portion of this provision states, in full:

Subject to the supervisory control of the supreme court of appeals, each circuit court shall have general supervisory control over all magistrate courts in the circuit. Under the direction of the chief justice of the supreme court of appeals, the judge of the circuit court, or the chief judge thereof if there be more than one judge of the circuit court, shall be the administrative head of the circuit court and all magistrate courts in the circuit.

W. Va. Const. art. VIII, § 6.

15. We found magistrate courts are independent, constitutionally created courts, and the power exercised by those courts "is subject only to the constitution and the law." Syl. Pt. 3, *Skinner*; *see* W. Va. Const. art. VIII, § 10 (providing, in part, that "[t]he legislature shall establish in each county a magistrate court or courts ...").

16. "Circuit courts shall have control of all proceedings before magistrate courts by mandamus, prohibition and certiorari..... Circuit courts shall have appellate jurisdiction in all cases, civil and criminal, where an appeal, writ of error or supersedeas is allowed by law to the judgment or proceedings of any magistrate court...." W. Va. Const. art. VIII, § 6, in part.

17. *See supra* note 14.

18. There was no proceeding in mandamus, prohibition, or certiorari brought warranting entry of the order. *Id.* at 758, 278 S.E.2d at 634. "As a general rule, any order promulgated *sua sponte* by a superior court which purports to control the judicial function in proceedings in a lower court is void *ab initio.*" Syl. Pt. 10, *Skinner*.

Article VIII, Section 10 of the West Virginia Constitution. *Id.* at 759, 278 S.E.2d at 634–35. This section provides, in part:

> The *division of the business* of a magistrate court in any county in which there shall be more than one magistrate of such court between the magistrates thereof so as *to promote and secure the convenient and expeditious transaction of such business* shall be determined in such manner or by such method as shall be prescribed by the judge of the circuit court of such county, or the chief judge thereof, if there be more than one judge of such circuit court.

W. Va. Const. art. VIII, § 10 (emphasis supplied in *Skinner*). We interpreted this section, along with the relevant language contained in Article VIII, Section 6, essentially as " 'housekeeping' provisions," designed to facilitate the efficiency of the magistrate court system. *Id.* at 759, 278 S.E.2d at 635. In this light, we concluded the circuit court's order, governing the dismissal of warrants in the magistrate courts, did not fall within the realm of its "housekeeping" authority. Therefore, we awarded a writ of prohibition restraining the implementation of the order. *Id.* at 761, 278 S.E.2d at 636.

█ Like *Skinner,* the order designating the parking area in the present case was issued sua sponte, and it did not grow out of an underlying action. Consequently, it is evident that the order was not issued pursuant to the circuit court's appellate jurisdiction under the first prong of the *Skinner* analysis. However, unlike the attempt to assert control over the dismissal of warrants as occurred in *Skinner,* we find the Respondent Judge's order designating the magistrate court parking area did not interfere with the judicial function or with the judicial discretion of the magistrate court in anyway.[19] By its very nature, we conclude the control of the parking area was an administrative function within the second prong of the *Skinner* analysis. Therefore, the Respondent Judge clearly had the power to issue the order pursuant to the circuit court's general administrative authori-

ty contained in Article VIII, Sections 6 and 10.

In the present case, there is the question of whether a circuit court's inherent authority to control resources (including parking) can prevail over specific legislation granting such power to county commissions. *See* W. Va.Code § 7–1–3s. To answer this question, we must make a more fundamental inquiry about the separation of powers doctrine and the scope of a court's inherent authority to require sufficient resources for it to perform its functions.

### 2.

### Separation of Powers

█ As part of our constitutional democracy on both the national and state level, we ascribe to the principle that there shall be three equal branches of government—legislative, executive, and judicial. Article V, Section 1 of the West Virginia Constitution states, in part: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others. . . ." W. Va. Const. art. V, § 1. These "separate and distinct" branches of government fulfill the essential function of "checks and balances." In *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 214 S.E.2d 467 (1975), we explained:

> The system of "checks and balances" provided for in American state and federal constitutions and secured to each branch of government by "Separation of Powers" clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch.

*Id.* at 402, 214 S.E.2d at 477; Syl. Pt. 1, *Frazier.* As with the executive and legislative branches of government, the role the judicial branch plays in the checks and balancing process cannot be understated.

---

**19.** Parking space is certainly not a constitutionally guaranteed resource for public officials and their staff. However, when a public entity pos-

sesses a resource, such as space for parking, then obviously the judicial branch of government is entitled to its fair share of such resource.

On several occasions, this Court has found it necessary to defend the right of the citizens of this State to have a free and independent judiciary.[20] In *State ex. rel. Steele v. Kopp*, 172 W.Va. 329, 305 S.E.2d 285 (1983), we emphasized that "the role of this Court is vital to the preservation of the constitutional separation of powers of government where that separation, delicate under normal conditions, is jeopardized by the usurpatory actions of the executive or legislative branches of government." 172 W.Va. at 337, 305 S.E.2d at 293. Not only does our Constitution explicitly vest the judiciary with the control over its own administrative business,[21] but it is a fortiori that the judiciary must have such control in order to maintain its independence.

Other courts which have examined the issue of whether the judiciary may invoke its inherent power to require necessary resources (such as adequate parking, office space, and other facilities) have found that it falls within the administrative functions of the courts. In one case involving a parking dispute, an Ohio court conducted an ex parte hearing and, thereafter, entered an order enjoining the police chief and his officers from parking a patrol wagon in such a way that would interfere with the court's parking area. *In re Obstruction of Summit County Driveway by Akron Police Dep't*, 108 Ohio App. 338, 339–40, 161 N.E.2d 452, 454 (1959). Although ultimately the Ohio appellate court dismissed the police chief's appeal of the lower court's order for lack of finality, the appellate court stated it had "no doubt" the court had the authority to conduct the hearing and enter the order. *Id.* at 341, 161 N.E.2d at 455. The appellate court further stated that, over and above its constitutional and statutory powers, "a court possesses all reasonable powers necessary to preserve the free and untrammeled exercise of its functions and to that end may, in appropriate cases, conduct *ex parte* hearings and make *ex parte* orders without formally instituting an action to secure the desired relief." *Id.*

In upholding a lower court's inherent authority to order a county commission to provide security to a courthouse, the Supreme Court of Colorado reiterated the basic principle that a court holds those "powers reasonably required to act as an efficient court." *Board of County Comm'rs v. Nineteenth Judicial Dist.*, 895 P.2d 545, 547–48 (Colo.1995) (internal quotations omitted). The court also quoted one of its prior decisions where it eloquently stated that it is the responsibility and duty of the courts to be completely independent. Such independence

"is not only axiomatic, it is the genius of our government.... It is abhorrent to the principles of our legal system and to our form of government that courts, being a coordinate department of government, should be compelled to depend upon the vagaries of an extrinsic will.... [It] would interfere with the operation of the courts, impinge upon their power and thwart the effective administration of justice. These principles, concepts, and doctrines are so thoroughly embedded in our legal system that they have become bone and sinew of our state and national polity."

*Id.* (quoting *Smith v. Miller*, 153 Colo. 35, 40–41, 384 P.2d 738, 741 (1963)).

Importantly, however, the Colorado court recognized the inherent power of the judiciary is not unfettered and generally is "limited to matters that are reasonably necessary for [its] ... proper functioning...." *Id.* (citations omitted). The judiciary must be wary not to overstep its boundaries and violate the separation of powers doctrine it is trying to protect by encroaching upon legislative and executive affairs. It is the prudent use of the judiciary's inherent power which will advance "the public interest of a cooperative

---

20. *See* Syl. Pt. 3, *Frazier* (providing, in part, "the Judiciary, not the executive branch, is vested with the authority to resolve any substantial, genuine, and irreconcilable administrative conflicts regarding court personnel"); Syl. Pt. 3, *Rutledge* (stating, in part, "[a] circuit judge has complete control of the deputy circuit clerk assigned to her ..."); *Bagley*, 161 W.Va. at 658–59, 246 S.E.2d at 114–15 (holding that our constitution prohibits both the legislative and executive branches from altering the judicial branch's budget); *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973) (finding that the judicial branch has inherent power to set its budget).

21. *See e.g* W. Va. Const. art. VIII, §§ 3, 6, and 10.

and harmonious governmental structure."
*Id.* (citation omitted); *see also Board of
Comm'rs v. Riddle*, 493 N.E.2d 461, 463 (Ind.
1986) (finding the issue to be resolved is
whether the mandate for office space "is
reasonably necessary for the operation of the
court or court related functions, and if so,
whether the mandate adversely affects any
governmental interest"); *Anderson County
Quarterly Court v. Judges*, 579 S.W.2d 875,
879 (Tenn.Ct.App.1978) (holding "however
broad and justifiable the use of inherent pow-
ers may be, it is not a license for unwarrant-
ed flexing of the judicial power. The gener-
ally recognized standard for applying the
inherent powers doctrine requires its use to
be reasonable and necessary.");[22] 21 C.J.S.
*Courts* § 7 at 14 (providing "[t]here is inher-
ent power in the courts to provide facilities,
personnel, and resources reasonably neces-
sary for the performance of judicial func-
tions").

 It is clearly a widely accepted prin-
ciple in this country that courts have inher-
ent authority to require resources such as
sufficient funds for operating expenses,[23]
work space,[24] parking space, supplies, and
other material items.[25] In order for a court
to invoke use of its inherent power to require

resources, the court must demonstrate that
such resources are reasonably necessary for
the performance of its responsibilities in the
administration of justice. Although courts
must be cautious not to reach beyond the
power of the judicial branch, it is crucial for
the judiciary to be able to invoke such power
as is reasonably necessary to maintain itself
as an independent and *equal* branch of our
government.[26] It is the constitutional obli-
gation of the judiciary to protect its own
proper constitutional authority by upholding
the independence of the judiciary. Of
course, whenever a conflict arises between
the judiciary and another branch of govern-
ment, the best first approach ordinarily
would be to reach an amicable resolution of
the problem without resorting to court or-
ders or other legal actions. However, a
court is not restricted to negotiation if an
amicable solution cannot be found. A court
may use the legal resources available to it to
defend those interests it is constitutionally
bound to protect, including, but not limited
to, ex parte orders in necessary circum-
stances in administrative matters within the
court's inherent authority.[27]

Having enunciated these broad principles,
we turn to the facts at hand. Although a

**22.** The court in *Anderson County* also held that a
court utilizing its inherent "power must establish
reasonable necessity by 'clear, cogent and con-
vincing proof.' " *Id.* at 881.

**23.** *See* Syl. Pt. 4, *Brotherton* (holding "[t]he judi-
ciary department has the inherent power to de-
termine what funds are necessary for its efficient
and effective operation"); Syl. Pt. 3, *Bagley*
(quoting same syllabus point); *see also State ex
rel. Indianapolis–Marion County Bldg. Authority
v. Superior Court of Marion County, Rm. No. 1*,
264 Ind. 313, 344 N.E.2d 61 (1976) (stating court
has inherent power to have more efficient tele-
phone service installed); *O'Coin's, Inc. v. Trea-
surer of Worcester County*, 362 Mass. 507, 287
N.E.2d 608 (1972) (paying merchant for tape
recorder and tapes purchased by judge for use
during criminal proceedings); *Commonwealth
ex. rel. Carroll v. Tate*, 442 Pa. 45, 53–55, 274
A.2d 193, 198 (1971) (finding a court has the
inherent power to require "necessities to be fur-
nished and to direct payment therefor out of the
public treasury"); *State ex rel. Moran v. Depart-
ment of Admin.*, 103 Wis.2d 311, 307 N.W.2d 658
(1981) (financing installation of state-wide judi-
cial computer network).

**24.** *See generally State ex rel. Hillyer v. Tuscarawas
Cty. Bd. Of Commrs.*, 70 Ohio St.3d 94, 99–100,

637 N.E.2d 311, 316 (1994) (finding that "the
court of appeals did not err in issuing a writ of
mandamus compelling the board [of commis-
sioners] to provide suitable facilities consistent
with" the relevant statute). By way of analogy,
the West Virginia Legislature appropriated what
space it determined it needed by legislative act.
*See* W. Va.Code § 4–1–20 (1994) (designating
extensive space in capitol building to be used by
the legislature).

**25.** For examples, see *supra* note 23.

**26.** *But see Knuepfer v. Fawell*, 96 Ill.2d 284, 295,
70 Ill.Dec. 708, 712, 449 N.E.2d 1312, 1316
(1983) (stating a court may use its inherent pow-
er to enter an order "only in exigent circum-
stances"). We decline to apply such a stringent
standard as it may prevent a court from carrying
out its constitutional duties in some cases. In-
stead, we believe the reasonable necessity stan-
dard allows the judiciary the ability to fulfill its
responsibilities without permitting it to encroach
upon the responsibilities of the other branches of
government.

**27.** *See generally Frazier*, 193 W.Va. at 32, 454
S.E.2d at 77 (granting writ of mandamus in favor
of circuit court judge, compelling sheriff and

writ of prohibition was never filed and it appears that the conflict over the contempt is now moot, Relators do raise in their petition for habeas corpus the substantive issues of the court's authority to enter its "General Order." Thus, in order to resolve this matter, we address it specifically.

In this case, the Respondent Judge found the parking area was being paid for out of the magistrate court fund. The magistrate court fund exists pursuant to West Virginia Code § 50–3–4 (1994) and consists of "all costs collected in magistrate courts in a civil or criminal proceeding...." W. Va.Code § 50–3–4. The statute further provides "[a] county may, *in accordance with the supervisory rules of the supreme court of appeals,* appropriate and spend from such fund such sums as shall be necessary to defray the expenses of providing services to magistrate courts." *Id.* (emphasis added). Under Rule 8(f) of the Administrative Rules for Magistrate Courts, we permit a county to use magistrate court funds to pay for "adequate parking spaces for *the public and the staff of the magistrate court*" when such parking "for the magistrate court staff and the public is otherwise unavailable...." Rule 8(f) Admin. R. Mag. Ct. (emphasis added).

 In their memorandum of law, Relators contend the Commission has not limited, restricted, or prohibited the magistrate court staff's parking in any way. Assuming this statement is true, it appears that there is no actual present conflict between Rule 8 and

West Virginia Code § 7–1–3s. Certainly, if the Commission desired to do so, it could promulgate rules and regulations under West Virginia Code § 7–1–3s consistent with this Court's rule regarding the use of magistrate court funds. On the other hand, if a direct conflict would arise, we have said that the administrative rules adopted by this Court pursuant to Article VIII, Section 8 "have the force and effect of statutory law and operate to supersede any law that is in conflict with them." Syl. Pt. 1, *Stern Bros., Inc. v. McClure,* 160 W.Va. 567, 236 S.E.2d 222 (1977); *see also Frazier,* 193 W.Va. at 25 n. 8, 454 S.E.2d at 70 n. 8 (emphasizing that a statute is "superseded only if there is a *direct* conflict" with a rule). As the Commission only may use such magistrate court funds "as shall be *necessary* to defray the expenses of providing services to magistrate courts," W. Va.Code § 50–3–4, we conclude by the Commission's expenditure of the funds that the Respondent Judge committed no error in entering the order designating the parking area. Even more importantly, this dispute seems to fall clearly within that realm of inherent administrative authority which supports a court in requiring necessary resources for the performance of its duties.[28]

### III.

### CONCLUSION

For the foregoing reasons, we find the circuit court did not err in designating the

---

county commission "to provide and compensate a qualified bailiff selected by the ... [judge]"); *Rutledge,* 175 W.Va. at 381, 332 S.E.2d at 837 (upholding circuit court's ex parte order prohibiting the transfer of a deputy circuit clerk); Felix F. Stumpf, *Inherent Powers of the Courts* 61–65 (1994) (citing cases from other jurisdictions using mandamus actions, declaratory judgment actions, contempt proceedings, certiorari, debt actions, and ex parte orders to initiate the inherent power of the courts), citing, in part, *Powers v. Isley,* 66 Ariz. 94, 183 P.2d 880 (1947) (utilizing a declaratory judgment action to determine whether county board of supervisors could change salary of court reporters set by the county superior court); *Grimsley v. Twiggs County,* 249 Ga. 632, 292 S.E.2d 675 (1982) (using a mandamus action to compel the county to pay for part-time clerical help); *but see In re Alamance County Court Facilities,* 329 N.C. 84, 94, 102–08, 405 S.E.2d 125, 129, 134–38 (1991) (applying the reasonable necessity standard, but criticizing the

lower court's use of an ex parte order, finding, *sub judice,* it "exceeded what was reasonably necessary to the administration of justice under the circumstances ...").

**28.** We caution, however, that today's opinion should not be construed in a manner that would embolden judicial officers to embark on actions beyond the parameters of what is reasonable and necessary. The West Virginia Judicial Branch continues to exercise its independence and autonomy without encroachment at least in part because it has historically been immensely frugal and eminently judicious in its requirements and demands. We also emphasize that it is the spirit of cooperation and mutual respect between our three co-equal branches of government that has allowed our democracy to function as well as it has. To our partners in the Executive and Legislative branches, we must express our respect and appreciation for their role in this cooperative approach.

parking space in the first instance. We also find the contempt charges against Relators were purged by their restoration of the parking area in accord with the circuit court's contempt order. Consequently, Relators' request for habeas corpus relief is moot, and we direct the circuit court, if it has not already done so, to enter an order in the underlying case relieving Relators from the contempt order.

Writ denied with directions.