537 S.E.2d 908

**Dorothy CZAJA (now Wright), Plaintiff Below, Appellant,**

**v.**

**Mark CZAJA, Defendant Below, Appellee (Three Cases).**

**Nos. 27316–27318.**

Supreme Court of Appeals of West Virginia.

Submitted June 7, 2000.

Decided July 11, 2000.

James W. McNeely, Esquire, Greenville, West Virginia, Attorney for Appellant.

Richard H. Lorensen, Esquire, Lewisburg, West Virginia, Guardian ad Litem.

R. Brandon Johnson, Esquire, Stroebel & Johnson, Lewisburg, West Virginia, Susan H. Hewman, Esquire, Lewisburg, West Virginia, Attorneys for Appellee.

SCOTT, Justice:

This consolidated case presents issues surrounding three orders entered by the Circuit Court of Monroe County[1] in connection with Appellant Dorothy Kyle Czaja's (now Wright's) attempt to modify the original grant of unsupervised visitation to Appellee Mark Czaja. In case number 27316, Appellant seeks a reversal of an order entered by Judge Irons on March 3, 1999, through which Appellant and her counsel were found to be in contempt of court for failure to obey the lower court's orders concerning visitation. Through case number 27317, Appellant seeks a reversal of an order entered by Judge Irons on February 9, 1999, denying Appellant's exceptions to the November 23, 1998, Recommended Order of the family law master concerning Appellant's motion to restrict Appellee to supervised visitation. In the third case, number 27318, Appellant seeks a reversal of an order entered by Judge Kirk-

patrick on June 17, 1999, through which the circuit court found Appellant in contempt for failure to comply with court-ordered visitation; denied Appellant's Rule 59(a) New Trial motion pertaining to the March 3, 1999, ruling of Judge Irons; and denied Appellant's Rule 60(b)(1) and (b)(6) Motions for Relief from Judgment as to the visitation directives set forth in the February 9, 1999, order. After considering the arguments raised in conjunction with the submitted record in this matter, we affirm, in part, and reverse, in part, and remand for further proceedings consistent with this opinion.

I. Factual and Procedural Background

As a limited factual background to this highly-charged and heavily-litigated domestic case, the parties were married on November 25, 1988. During the course of their marriage, two children were born: Julianna, on August 29, 1989, and Mark, on July 25, 1991. Following their separation on August 12, 1993, divorce proceedings were initiated and a final order of divorce was entered on December 12, 1996.[2] Pursuant to the final order, Appellant was awarded custody of the two minor children and Appellee was granted visitation that comprised alternating weekends and holidays, as well as two separate three-week periods in the summer.

Beginning with the filing of Appellant's petition to modify visitation[3] on April 2, 1997, the issue of Appellee's entitlement to his original grant of unsupervised visitation rights has been the subject of continuous litigation. When the circuit court denied her motion to modify visitation rights,[4] Appellant refused to permit Appellee to exercise his visitation rights scheduled for Au-

---

1. Judge Irons was the presiding judge in this case until Appellant filed a motion seeking his disqualification. This Court appointed Judge Kirkpatrick by order dated April 5, 1999, after Judge Irons voluntarily recused himself in response to the disqualification motion.

2. On July 29, 1997, this Court refused Appellant's petition for appeal from the final order of divorce. Judge Irons observed in his February 9, 1999, order that many of the same allegations that Appellant asserts in support of her motion to modify visitation were raised previously in her petition for appeal from the final divorce order.

3. As grounds for the petition to modify, Appellant cited a December 13, 1994, hearing during the divorce proceedings wherein she raised allegations concerning Appellee's personal behavior and his ability to properly care for the parties' children. As an additional ground, Appellant referenced her testimony at that same hearing concerning Appellee's relationship with a fifteen-year-old female student in 1986, while Appellee was employed by the Monroe County school system, and more than two years before the parties' marriage.

4. The motion was denied by order dated July 9, 1997.

gust 3, 1997, to August 24, 1997. Appellee filed a motion for contempt, and during the course of the September 2, 1997, contempt hearing, Appellant alleged, for the first time,[5] that Appellee had improperly touched his seven-year-old daughter in June of 1997.[6] Based on this allegation, Judge Irons referred the matter to Child Protective Services ("CPS") for an investigation[7] and the court directed, by order dated November 6, 1997, that Appellee would have unsupervised daytime visitation pending the outcome of the CPS investigation. On January 20, 1998, CPS submitted a one-paragraph report to Judge Irons, in which caseworker Stephanie Lester states that she "was unable to substantiate abuse to the children by" Appellee. Ms. Lester did, however, recommend supervised visitation; this recommendation was based solely on the "risk of maltreatment" due to Appellee's sexual relationship with a minor student in 1986. *See supra* note 3.

Following the issuance of the CPS report, Appellant again refused to permit Appellee to exercise his visitation rights with his children in February 1998.[8] By order dated February 11, 1998, Judge Irons referred these visitation issues to Family Law Master

Wiley. Following four days of hearings in October 1998, FLM Wiley issued his Recommended Order on November 23, 1998, in which he recommended that Appellant's motion for supervised visitation be denied based on his conclusion that no credible evidence of sexual abuse had been established. He further recommended that Appellee be permitted to have a certain amount of makeup visitation to offset the visitation Appellant had denied him.[9] We observe that during the pendency of the referral to the FLM and the issuance of a decision, Appellee had no visitation with his children.[10] Not until an order was entered on December 21, 1998, directing supervised visitation[11] did Appellee gain the right to see his children following the circuit court's suspension of unsupervised visitation in February 1998.[12]

The circuit court, by order entered February 9, 1999, denied[13] Appellant's exceptions to the FLM's recommendations and directed that Appellee's previous grant of unsupervised visitation should be restored.[14] Notwithstanding the court's order, Appellant refused to deliver the children at the designated place on three successive Friday evenings—February 12, 19, and 26, 1999—

---

5. In its September 11, 1997, order, the circuit court states that Appellant did not report this incident to Child Protective Services and did not include this allegation as part of her pleadings.

6. Appellant alleged that Appellee had fondled Julianna's breast.

7. *See* W.Va.Code § 49–6A–1 to –10 (1999).

8. In a motion to suspend unsupervised visitation, filed January 30, 1998, Appellant stated that she "has respectfully suspended visitation and ... cannot in consideration of the safety and best interests of her children allow further unsupervised visitation...."

9. The FLM concluded that Appellee had been denied 69 days of visitation as a result of Appellant's obstructive efforts.

10. This Court is both troubled and perplexed that such a lengthy period of time passed—almost eleven months—during which no visitation took place between Appellee and his children. Since Appellant only asked for the cessation of unsupervised visitation through her January 30, 1998, motion, we must question why no efforts were taken on the part of Appellee or the lower court

to instigate *supervised* visitation at a time earlier than December 21, 1998.

11. The supervised visitation was to take place at the Family Refuge Center in Lewisburg, West Virginia, pending further order of the circuit court.

12. The lower court's decision to require supervised visitation in December 1998 appears to have been prompted by the lower court's outstanding consideration of Appellant's exceptions to the recommended decision of the FLM and the consequent lack of finality with regard to the FLM decision. The order reflects that Appellant did not object to supervised visitation.

13. Despite the lower court's considered opinion that the exceptions were waived due to their untimely filing, the circuit court did in fact consider and deny the exceptions in conjunction with its decision that the FLM's Recommended Order should be nonetheless reviewed due to the serious nature of the allegations raised by Appellant.

14. In this same order, the lower court also approved the makeup visitation specified by the FLM.

which forced Appellee to file another contempt motion.[15] At the March 1, 1999, hearing on Appellee's motion, the lower court found both Appellant and her counsel to be in contempt of court orders concerning visitation and required Appellant's counsel to pay opposing counsel's fees.[16]

On June 14, 1999, Judge Kirkpatrick[17] heard argument in conjunction with Appellant's post-ruling motions, through which she sought a reversal of the March 3, 1999, contempt order and relief from the visitation requirements set forth in the February 9, 1999, order. After considering the evidence presented, the circuit court denied Appellant's Rule 59 and Rule 60 motions and granted Appellee's March 8, 1999, separate motion for contempt for Appellant's failure to comply with the visitation directives set out in multiple orders.[18] As part of its June 17, 1999, order reflecting these rulings, the lower court outlined a mechanism which expressly authorizes the sheriff, following a contemplated court hearing, to take physical custody of the parties' children for the purpose of transporting same to Appellee in the event that Appellant prospectively decides to deny visitation rights to Appellee.

It is from these orders of February 9, 1999, March 3, 1999, and June 17, 1999, that Appellant brings this consolidated appeal. Each appeal will be separately discussed in chronological fashion with reference to the entry date of the respective order from which the appeal is taken.

## II. Discussion

### A. Appeal No. 27317—February 9, 1999, Order

The circuit court's order which is the subject of this appeal concerns the lower court's review of and adoption of the findings and recommendations of FLM Wiley. Appellee argues that Appellant failed to timely file her exceptions to the FLM's Recommended Order and has thereby failed to preserve her exceptions for appeal purposes. We agree.

The statutory provision which governs the filing of exceptions to decisions of family law masters is West Virginia Code § 48A–4–17 (1999). That section provides that: "Failure to timely file the petition [of exceptions to the FLM's recommended order] shall constitute a waiver of exceptions, unless the petitioner, prior to the expiration of the ten-day period, moves for and is granted an extension of time from the circuit court."[19] *Id.* (emphasis supplied). In its February 9, 1999, order, the circuit court ruled that:

> The recommended decision was served on the Plaintiff by mail on November 23, and the Plaintiff had until December 7, 1998 to file exceptions to this decision. Plaintiff subsequently filed a notice of extension of time to file exceptions, thereby extending the time for the filing of exceptions to December 17, 1998. Plaintiff did not actually file her exceptions until December 28, 1998.

Appellant maintains that the lower court was in error with regard to its ruling that her exceptions were untimely filed. She contends that the original date from which the ten-day period for filing extensions typically would be calculated—November 23, 1998, in this case—was not the proper date. Arguing that the FLM erred in not initially sending a copy of his recommended order to the guardian ad litem, Appellant notes that the FLM's decision was re-served on the parties and the guardian ad litem on December 3, 1998, by notice of that date with an indication that

---

15. The verified petition for contempt was filed with the lower court on February 16, 1999.

16. The March 3, 1999, order directs that Appellant's counsel, and not Appellant, is responsible for paying $3,052.50 to Susan Hewman and $3,000 to R. Brandon Johnson. These fees represent those amounts incurred by Appellee during the period of February 9, 1999, through March 1, 1999.

17. *See supra* note 1.

18. Those orders from which Appellee sought findings of contempt were entered respectively on February 9, 1999; February 26, 1999; and March 3, 1999.

19. Rule 22 of the Rules of Practice and Procedure for Family Law provides, in pertinent part, that: "The ten-day period for filing a petition for review under chapter 48A, article 4, section 17 of the Code ... shall commence on the date on which the parties are served with the notice and recommended order...."

December 17, 1998, was the deadline for filing exceptions. Since Appellant filed and received a ten-day extension for filing her exceptions, she contends that her pleading was not due to be filed until December 27, ten days after the December 17, 1998, deadline contained in the second notice issued by the FLM. We find several flaws in Appellant's self-serving deadline fashioning.

First and foremost, both of the named parties to this action were served with the notice and recommended order on November 23, 1998. While the original notice was not made a part of the record, there are numerous other pleadings submitted which indicate that the filing date for the exceptions pursuant to the first notice was December 7, 1998.[20] On the date those exceptions were due—December 7, 1998—Appellant filed notice of her request for a ten-day extension, as permitted under West Virginia Code § 48A-4-17 and Rule 23 of the Rules of Practice and Procedure for Family Law. In the December 7, 1998, order granting Appellant's ten-day extension, the lower court expressly deleted[21] language which had specified that Appellant had "until December, 27, 1998" to file her exceptions. Given the circuit court's actions in striking the date she supplied for

filing exceptions, we reject Appellant's argument that she had until December 27, 1998, to file those exceptions. The circuit court clearly granted Appellant one additional ten-day period to file her exceptions and that period commenced on December 7, 1998, and ended on December 17, 1998.[22]

■ The oversight on the part of the FLM in sending a copy of his recommended order to the guardian ad litem simply cannot be used offensively by Appellant[23] to expand the statutorily-provided period for filing her exceptions. Moreover, since both the named parties were timely and properly served with both notice and the recommended decision on November 23, 1998, there is no reason for suggesting that Appellant should be permitted to benefit by a later deadline that should have attached only to the guardian ad litem in the event he would have desired to file exceptions to the recommended decision of the FLM.[24] Upon our review of the record, this Court is left with a palpable sense that Appellant's counsel was trying to "buy" time in any fashion possible for filing Appellant's exceptions.[25]

■ The provisions of West Virginia Code § 48A-4-17 are clear in their intent. Failure

**20.** Appellant herself refers to this date as being the "original due date" in her petition for review of and statement of exceptions to the FLM's recommended order, which she filed on December 28, 1998.

**21.** Judge Irons penned his initials above the stricken language.

**22.** In her attempt to use the Rules of Practice and Procedure for Family Law to her advantage, Appellant has overlooked Rule 23 which sets forth that "[o]nly one ten-day extension may be granted." Appellant sought and obtained that one ten-day extension which began on December 7, 1998.

**23.** Appellant's counsel was the party who sought to have the recommended order re-noticed to "cure" the alleged "defect in service." Even this re-noticing appears to be tactically motivated. In her notice seeking an extension of time for the filing of her exceptions, Appellant inserted a footnote stating that: "Notice of Recommended Order originally issued November 23, 1998, and reissued on December 3, 1998, to cure defect in service." Not only do we disagree with Appellant's characterization of the failure to serve the guardian ad litem as a "defect in service," but we question Appellant's designation of the guard-

ian ad litem as a party within the meaning of Rule 21(c) of the Rules of Practice and Procedure for Family Law. That rule requires that the recommended order "shall be served on all parties who have appeared or on their attorneys of record." Certainly, the guardian ad litem should be served with a copy of the recommended order, both as a matter of professional courtesy and to permit zealous advocacy where appropriate, but the guardian ad litem's participatory role appears to be more as an advocate rather than as a party. *See In re Scottie D.*, 185 W.Va. 191, 198, 406 S.E.2d 214, 221 (1991).

**24.** No exceptions were filed by the guardian ad litem.

**25.** Given the great length to which counsel discusses all the deadlines as part of Appellant's exceptions to the Recommended Order, it appears that counsel was acutely aware of and concerned about having missed the deadline for timely filing Appellant's exceptions. Complaining about how difficult it was to get the exceptions filed during the holiday season, Appellant's counsel states that he had to "sacrific[e] his Christmas holiday" in order to complete the exceptions, but then instructs: "This recitation is not intended to elicit sympathy for counsel."

to comply with the ten-day period for filing exceptions to a recommended order of a family law master, barring a timely filing of and approval of one ten-day extension period, is fatal with regard to preserving those exceptions for appeal. *See* W.Va.R.Prac. & Proc. Fam.Law 23. The record in this case demonstrates that the lower court, in striking Appellant's attempt to further lengthen her exception-filing period from the language of the December 7, 1998, order, clearly announced its position that the extension granted was not, as Appellant advocates, until December 27, 1998, but was instead, until December 17, 1998. Since Appellant admits that she did not file her exceptions until December 28, 1998, her exceptions were indisputably filed outside the statutorily-established time frame for preserving those exceptions for appeal. *See* W.Va.Code § 48A–4–17.

■ Just as we are unpersuaded that Appellant timely filed her exceptions, we are similarly unconvinced by Appellant's argument that the lower court's consideration of Appellant's exceptions amounted to a waiver of the statutory proscription set forth in West Virginia Code § 48A–4–17. The lower court made clear in its February 9, 1999, order that,

> [a]lthough the Plaintiff's [Appellant's] exceptions are untimely and are not entitled to any consideration by this Court, because the Plaintiff is seeking supervised visitation, under a theory that the children would [be] at risk, if the Defendant [Appellee] were allowed to have unsupervised visitation, the Court has proceeded to review the exceptions, out of an abundance of

precaution, in order to determine if there is any merit to the exceptions.

The lower court could not, simply by virtue of its decision to review Appellant's exceptions "out of an abundance of precaution," have abrogated the statutory language which mandates in nondiscretionary terms that a "[f]ailure to timely file the petition *shall* constitute a waiver of exceptions." W.Va.Code § 48A–4–17 (emphasis supplied). Judge Irons made clear that his decision to review the exceptions was prompted by concern that the serious nature of the allegations warranted the court's scrutiny notwithstanding Appellant's failure to properly preserve those exceptions for appellate purposes.

In an arguably analogous case, this Court upheld a lower court's review of a FLM's recommended decision where no exceptions had been filed and the parties had thus waived their right to file exceptions. In *John D.K. v. Polly A.S.*, 190 W.Va. 254, 438 S.E.2d 46 (1993), this Court construed the statutory predecessor to West Virginia Code § 48A–4–17,[26] which contained the same mandatory language concerning waiver of exceptions, and determined that the lower court could review the evidence underlying a FLM's order despite the parties' statutory waiver of their right to file exceptions. *See* 190 W.Va. at 258, 438 S.E.2d at 50. Just as the circuit court felt compelled to engage in a review[27] in *John D.K.* despite the absence of filed exceptions, Judge Irons similarly conducted his review of Appellant's evidence out of a sense of judicial obligation. In the instant case, the circuit court, like the FLM, found no credible evidence of sexual abuse which would have warranted supervised visitation.[28] The lower court's consideration of the excep-

**26.** *See* W.Va.Code § 48A–4–7 (1992).

**27.** The court in *John D.K.* actually went a step further and conducted an evidentiary proceeding. *See* 190 W.Va. at 257, 438 S.E.2d at 49.

**28.** This Court set forth the standard which must be met before supervised visitation is required in syllabus point two of *Mary D. v. Watt,* 190 W.Va. 341, 438 S.E.2d 521 (1992):

> Prior to ordering supervised visitation pursuant to *W.Va.Code,* 48–2–15(b)(1) [1991], if there is an allegation involving whether one of the parents sexually abused the child involved, a family law master or circuit court must make a finding with respect to whether that parent

sexually abused the child. A finding that sexual abuse has occurred must be supported by credible evidence. The family law master or circuit court may condition such supervised visitation upon the offending parent seeking treatment. Prior to ordering supervised visitation, the family law master or circuit court should weigh the risk of harm of such visitation or the deprivation of any visitation to the parent who allegedly committed the sexual abuse against the risk of harm of such visitation to the child. Furthermore, the family law master or circuit court should ascertain that the allegation of sexual abuse under these circumstances is meritorious and if made in the context of the family law proceeding, that such

tions, and its denial of same, does not nullify the statutory waiver which resulted from Appellant's untimely filing of her exceptions. Based on our conclusion that Appellant failed to preserve her exceptions to the FLM's Recommended Order, we do not address the substance of those exceptions. *See* W.Va. Code § 48A–4–17.

### B. Appeal No. 27316—March 3, 1999, Order

■ At the center of this appeal are the rulings made by Judge Irons following a March 1, 1999, hearing [29] on Appellee's contempt motion following Appellant's denial of visitation to Appellee in February 1999. Finding Appellant in contempt for her failure to abide by the provisions of three orders setting forth specific visitation directives,[30] the lower court imposed a fine of $50 per day for each of thirteen days [31] of visitation denied to Appellee for a total fine of $650.

Appellant raises numerous procedural challenges [32] to the lower court's contempt ruling and argues additionally that the fine imposed converted the civil contempt proceeding into a criminal matter. As we announced in syllabus point one of *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996), the following standard governs our review of civil contempt cases:

> In reviewing the findings of fact and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

■ Appellant contends that the circuit court lacked jurisdiction to enter a contempt

---

allegation is reported to the appropriate law enforcement agency or prosecutor for the county in which the alleged sexual abuse took place. . . .

Conducting its review under this standard, the circuit court concluded that the FLM was correct in not requiring supervised visitation since there was no credible evidence of any sexual abuse by Appellee to the children. The circuit court states in its February 9, 1999, order:

> There was no direct testimony of sexual abuse by the Defendant [Appellee], directed toward either child, other then [sic] that of the Plaintiff [Appellant]; there was no testimony from the children to the effect the Defendant had abused either child; and there was no expert testimony on this point, even though this Court had previously referred the children and the parties for a psychological evaluation. Other then [sic] the hearsay testimony of the Plaintiff, concerning the allegation of fondling, all other testimony of sexual abuse concerned events predating the separation, in 1994. This is particularly significant, in light of Plaintiff's obligation to show a change of circumstances, in order to modify an existing visitation order.

**29.** At the outset of our discussion of this appeal we note that only a small portion of the March 1, 1999, hearing transcript was originally filed with this Court. Item No. 48 of the amended designation of the record corresponds to a March 16, 1999, "Notice of Filing of Portion of Transcript of March 1, 1999, Hearing" which includes only pages 21 through 40. In response to this Court's stated concern that a complete transcript had not been included as part of the designated record, Appellee submitted post oral argument a complete transcript of the March 1, 1999, hearing.

In fairness to Appellant, there appears to be a discrepancy between the date of the notice listed on the amended designated record—April 10, 1999—and the date of the notice included as part of Item No. 48—March 16, 1999.

**30.** *See supra* note 18.

**31.** Those dates of missed visitation include February 12, 13, 14, 26, 27, 28 and seven days of missed makeup visitation.

**32.** One such procedural challenge which we reject out-of-hand is her contention that the lower court was without authority to enter the March 3, 1999, contempt order since Appellant's filing of a Motion for New Trial under Rule 59(a) in conjunction with the lower court's February 9, 1999, order, denying her exceptions to the FLM's Recommended Decision, invoked an automatic stay under Rule 62(a) of the West Virginia Rules of Civil Procedure. Appellant reasons that the visitation directives set forth in the February 9, 1999, order could not be enforced vis-a-vis the contempt order based on her filing of the new trial motion. Critically, the order from which Appellant sought a new hearing was a denial of her petition to modify visitation. The circuit court's denial of Appellant's motion to modify impliedly continued the previously-ordered visitation pursuant to the final order of divorce entered in 1996. We simply cannot sanction the offensive use of a procedural mechanism intended to postpone enforcement of a judgment in a manner unintended by the rule—to support Appellant's position that she had *no* obligation to comply with directives concerning visitation pending a ruling on her Rule 59(a) motion.

ruling based on her allegation that she was served with a copy of the order to show cause setting a time for the hearing, but not an accompanying petition for contempt. She also asserts a notice problem with regard to the fact that she was not informed that the circuit court would consider evidence as to any visitation denials other than that which was denied on February 12, 1999, or any court orders other than the one entered on February 9, 1999. Like Judge Kirkpatrick, who reviewed these same issues in conjunction with Appellant's post-ruling motions, we agree that the essence of Appellant's procedural challenge to the contempt ruling is notice-based, rather than jurisdictional in nature. In his June 17, 1999, order, Judge Kirkpatrick ruled, when considering Appellant's motion for relief from the March 3, 1999, contempt ruling:

> The undersigned special judge observes that the issue outlined by plaintiff's counsel is actually a claimed problem relating to notice. At the present hearing of June 14, 1999, the court learned that plaintiff asserts that she was served only a copy of the Order to Show Cause, with no petition attached. Upon an examination of the court file, the court is of the opinion that the Order to Show Cause alone provided the plaintiff with significant *actual* knowledge of a contempt matter to be heard on March 1, 1999, so as to be generally informed of the proceedings. Combining such factor with the additional fact that plaintiff's counsel of record admitted at the hearing of June 14 that he did receive a copy of the petition, via United States Mail, cured any defect of notice which may have existed in connection with the March 1, 1999 hearing. The transcript of record clearly indicates that neither the plaintiff or [sic] her counsel suffered from surprise

in regard to the visitation issues raised at this hearing. (emphasis supplied)

Just as Judge Kirkpatrick was convinced that Appellant was fully-informed of the nature of the contempt proceedings, our review of the record similarly reveals no impediment to enforcement of the contempt ruling arising from any notice-based concerns.[33]

■ Given the interrelatedness of each of the visitation denials and the core similarity of the legal issue presented by such denials, we would be hard-pressed to find a constitutionally significant notice problem with regard to the court's consideration of each instance where visitation was denied after the entry of the February 9, 1999, order, rather than limiting its ruling to only those missed visitations that were expressly delineated on the petition for contempt.[34] Like Appellant's claims concerning the deadline for filing exceptions to the FLM's order, we find this one to be overly technical and aimed solely at avoiding the effects of a deleterious ruling. Appellant's attempt to convince us that the lower court abused its discretion in entering the contempt ruling by expanding the dates of missed visitation to encompass all those dates between the entry of the February 9, 1999, order and the March 1, 1999, hearing is unavailing. In this Court's opinion, the lower court would have been remiss were it to have limited its contempt ruling to the one date of denied visitation specified in the petition. Moreover, the lower court's arguable expansion of the scope of the contempt proceeding to include those dates where visitation denial occurred subsequent to the filing of the contempt petition was within the circuit court's "plenary power to order and enforce a noncustodial parent's visitation rights with his or her children."

---

**33.** We reject outright the existence of any subject matter jurisdictional flaw in the contempt ruling. Clearly, the lower court had jurisdiction to consider the entry of a contempt ruling that emanated from a previous order which it had entered. *See* W.Va.Code § 48–2–22 (1999).

**34.** Because the petition for contempt only included the visitation denied on February 12, 1999, Appellant argues that the lower court erred in permitting Appellee to introduce evidence concerning charges other than those originally filed

against her. *See Doctors Mem'l Hosp., Inc. v. Woodruff*, 165 W.Va. 324, 267 S.E.2d 620 (1980). We reject this argument since the charge at issue—visitation denial—was a type of "charge" over which the lower court had continuing jurisdiction and because there is no question that Appellant was "fully and plainly informed" as to the nature of the charge that was being brought against her. Syl. Pt. 2, in part, *State ex rel. Hoosier Eng'g Co. v. Thornton*, 137 W.Va. 230, 72 S.E.2d 203 (1952).

Syl. Pt. 2, in part, *Carter,* 196 W.Va. at 241, 470 S.E.2d at 195.

A circuit court's authority to enter a contempt ruling in a domestic matter is governed by the provisions of West Virginia Code § 48–2–22 (1999). Advocating a construction of the statutory provisions which would defeat the lower court's finding of contempt, Appellant argues that the lower court failed to adhere to the requirement imposed by subsection twenty-two by not first making a finding that she had a method available for purging herself of the contempt. Contrary to her contentions, subsection 22(b) is not written in terms of **requiring** the court to first make a finding regarding the contemnor's ability to purge herself before imposing a contempt sanction. The statute is stated in conditional terms: "[I]f the court further finds the person has the ability to purge himself of contempt, the court shall afford the contemnor a reasonable time and method whereby he may purge himself of contempt." W.Va.Code § 48–2–22(b). Thus, the statute only mandates the identification of a method and reasonable time for purging "if" the lower court determines that purging can be

accomplished. Clearly, under the circumstances for which contempt was found in this case—thirteen instances of refused visitation—Appellant could not have been found by the circuit court to be capable of purging herself of those dates where visitation had already been denied.[35]

While citing no law in support of this proposition, Appellant contends that by imposing a fine Judge Irons converted the civil contempt proceeding into a criminal matter.[36] In a recent opinion addressing the use of West Virginia Code § 48–2–22 in connection with enforcement of visitation rights, this Court both characterized and affirmed the entry of a contempt ruling, which included a $300 fine, as civil. *See Carter,* 196 W.Va. at 242–43, 470 S.E.2d at 196–97. Likewise, in *State ex rel. Lambert v. Stephens,* 200 W.Va. 802, 490 S.E.2d 891 (1997), this Court, in discussing the distinctions between civil and criminal contempt, stated: "Another appropriate sanction in civil contempt cases is an order requiring the contemner to pay a fine as a form of compensation or damages to the party aggrieved by the contemptuous conduct."[37] *Id.* at 806,

35. This Court in *State ex rel. Robinson v. Michael,* 166 W.Va. 660, 276 S.E.2d 812 (1981), discussed how the absence of an ability for an individual to purge himself of contempt (such as an inability to pay an arrearage) does not convert the matter to a criminal contempt. *Id.* at 671–72, 276 S.E.2d at 819 n. 11. We observed, citing a Florida Supreme Court decision, that an " 'ability to comply' could be based on a showing that the contemner [sic] 'previously had the ability to comply but divested himself of that ability through his fault or neglect designed to frustrate the intent and purpose of the order' as well as by a showing of present ability." *Id.* (citing *Faircloth v. Faircloth,* 339 So.2d 650, 651 (Fla. 1976)).

36. *See* W.Va.Code § 61–5–26 (1997) (authorizing fines as a penalty for summary criminal contempt).

37. Because the March 3, 1999, order directs Appellee to pay her $650 fine to the court, we assume that the lower court did not intend to turn over these funds to Appellee and that therefore, the levied fine was not compensatory in nature. While the non-compensatory nature of the fine might suggest that the contempt proceeding was criminal, this distinction, upon analysis, is without significance. The quintessence of any argument which seeks to box a contempt ruling as criminal, rather than civil, is the en-

hanced procedural protections which attach to a criminal contempt proceeding. *See Int'l Union, United Mine Workers v. Bagwell,* 512 U.S. 821, 826–27, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (identifying such protections as including notice of charges, assistance of counsel, right to present a defense, privilege against self-incrimination, right to proof beyond a reasonable doubt, and the right to a jury trial for "serious" criminal contempts involving imprisonment of more than six months, and holding that since "[m]ost contempt sanctions share punitive and coercive characteristics . . . the fundamental question underlying the distinction between civil and criminal contempts is what process is due for the imposition of any particular contempt sanction"). Given the reduced need for "extensive, impartial factfinding" in civil contempt proceedings, these protections are typically viewed as less critical in a civil setting. *Id.* at 833, 114 S.Ct. 2552. Because there was a minimal factfinding role for the lower court to play in this case, as the issue of denied visitation was, for the most part, admitted, any arguable denial of the procedural protections invoked in criminal contempt proceedings is without the necessary prejudicial effect to require reversal. *See United States v. United Mine Workers,* 330 U.S. 258, 295, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

Both scholars and courts have acknowledged that "the categories, 'civil' and 'criminal' con-

490 S.E.2d at 895 (citing Syl. Pt. 3, *State ex rel. Robinson v. Michael,* 166 W.Va. at 660–61, 276 S.E.2d at 813). Thus, we find the law well-settled regarding the assessment of fines as a permissible sanction for civil contempt rulings. *See also United States v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (discussing use of fines in civil contempt proceedings for purpose of compensating party or to coerce compliance with court order).

▆▆▆▆▆ Appellant circuitously reasons that, because the circuit court failed to impose a sanction that included a method for purging the contempt, the civil contempt proceeding necessarily was transformed into a criminal matter. This argument fails because the determination of whether a contempt is civil or criminal is made with reference to the *purpose* being served by the imposition of the sanction rather than the nature of the sanction imposed.[38] *Robinson,*

tempt, are unstable in theory and problematic in practice." *Bagwell,* 512 U.S. at 845, 114 S.Ct. 2552 (quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911)) (J., Ginsburg, concurring); *see also* Earl C. Dudley, Jr., *Getting Beyond the Civil/Criminal Distinction; A New Approach to the Regulation of Indirect Contempts,* 79 Va.L.Rev. 1025 (1993). The difficulty intrinsic to any attempt to neatly package contempt rulings into civil or criminal classifications stems from the fact that "[c]ivil contempt proceedings, although primarily remedial, also 'vindicat[e] ... the court's authority'; and criminal contempt proceedings, although designed 'to vindicate the authority of the law,' may bestow 'some incidental benefit' upon the complainant, because 'such punishment tends to prevent a repetition of the disobedience.' " *Bagwell,* 512 U.S. at 845, 114 S.Ct. 2552 (quoting *Gompers,* 221 U.S. at 443, 31 S.Ct. 492) (J., Ginsburg, concurring).

Admittedly, West Virginia Code § 48–2–22 does not address the imposition of fines as a sanction for a civil contempt ruling. Such authority for assessing fines in a civil contempt setting arises from the inherent authority of the court to enforce its orders. *Bartles,* 196 W.Va. at 389, 472 S.E.2d at 835; *see also Mackler Productions, Inc. v. Cohen,* 146 F.3d 126, 129 (2nd Cir.1998) (stating that "the power of a court to punish for contempt may be 'inherent' " but noting that penalties are determined by Congress) (citing *Ex Parte Robinson,* 86 U.S. (19 Wall.) 505, 22 L.Ed. 205 (1873)). We recognized in *Bartles* that "[t]he choice of imposition of sanctions for failing to comply with a court order lies with the trial court, and we will not lightly disturb that decision." 196 W.Va. at 389, 472 S.E.2d at 835. Moreover, in examining the provisions of West Virginia Code § 48–2–22, it is clear that the statute itself contemplates a fusing of criminal and civil contempts as subsection b permits a trial court to "treat a finding of criminal contempt as a civil contempt." W.Va.Code § 48–2–22(b).

We further recognize the arguable impotence that a circuit court has with regard to imposing an effective means to both sanction a contumacious party's flagrant violation of court orders regarding indiscrete issues, such as visitation directives, and, at the same time, to compel compliance with those orders. Short of incarcera-

tion, the lower court had no other means of coercing Appellant into complying with the court's directives concerning visitation.

While this case does not present the opportunity for this Court to reconsider the continued viability of its decision in *Hendershot v. Hendershot,* 164 W.Va. 190, 263 S.E.2d 90 (1980), with regard to our ruling that jury trials are required whenever a circuit court intends to incarcerate a contemnor, we question whether that ruling comports with the reasoning of the United States Supreme Court decisions which only require jury trials where the criminal contempt can be viewed as "serious" based on the length of the incarceratory period, with "serious" being defined as involving a period of incarceration that minimally spans six months. *See Bagwell,* 512 U.S. at 827, 114 S.Ct. 2552; *Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (holding that "petty contempt like other petty criminal offenses may be tried without a jury and that contempt of court is a petty offense when the penalty actually imposed does not exceed six months or a longer penalty has not been expressly authorized by statute"); *Bloom v. State of Illinois,* 391 U.S. 194, 207, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) (segmenting right to jury trials between those contempts which qualify as petty offenses based on nominal period of incarceration and contempts where sentence renders offense "serious," without specifying bright line rule as to what sentence length necessarily converts offense into "serious" category, and observing that "[p]rosecutions for contempt play a significant role in the proper functioning of our judicial system"). We leave that issue for another day since the lower court did not impose the penalty of incarceration in this case.

**38.** Whereas we previously looked to the penalty imposed (e.g. jail term with opportunity for purging vs. without and determinate vs. indeterminate sentencing) in labeling contempt matters, this Court altered that approach beginning with *Robinson* and now examines the purpose of the sanction, rather than the sanction itself, to identify the nature of the contempt ruling. *Cf. Floyd v. Watson,* 163 W.Va. 65, 73–74, 254 S.E.2d 687, 692 (1979) to *Robinson,* 166 W.Va. at 670, 276 S.E.2d at 818. Note, however, that this Court has, on more than one occasion, commented on the "indistinct" line which separates civil and

166 W.Va. at 670, 276 S.E.2d at 818; *accord Stephens,* 200 W.Va. at 806, 490 S.E.2d at 895. In syllabus point two of *Robinson* this Court explained: "Where the purpose to be served by imposing a sanction for contempt is to compel compliance with a court order by the contemner [sic] so as to benefit the party bringing the contempt action by enforcing, protecting, or assuring the right of that party under the order, the contempt is civil." [39] 166 W.Va. at 660, 276 S.E.2d at 813. Since the contempt ruling arose from, and was directed at, compelling compliance with an existing order concerning visitation to be afforded Appellee, the purpose of the sanction was clearly consonant with the objectives underlying civil contempt.

▮ While we find no procedural impediment to the imposition of a ruling of summary contempt against Appellant's counsel based on the record before us,[40] we find error with regard to the lower court's award of attorney's fees and costs against said counsel. During the March 1, 1999, hearing, Judge Irons decided, *sua sponte,* to award attorney's fees to Appellee's counsel that were incurred between the entry of the February 9, 1999, order and the March 1, 1999, hearing. As its basis for awarding attorney's fees, the lower court states in the March 3,

1999, order: "[T]he frivolous filings by plaintiff's counsel since the entry of the February 9, 1999 Order herein." [41] Appellant argues, and we agree, that the lower court was required to provide him with notice and an opportunity to be heard on the issue of sanctions being awarded, apparently under Rule 11 of the West Virginia Rules of Civil Procedure, before levying such sanctions against him.

The sole authority cited by the lower court for its entry of an order awarding attorney's fees against Appellant is this Court's decision in *Daily Gazette Co. v. Canady,* 175 W.Va. 249, 332 S.E.2d 262 (1985). While that decision clearly recognized the authority of a court, both inherent and rule-based, to assess attorney's fees,[42] we nonetheless admonished that "[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Id.* at 251, 332 S.E.2d at 264. In this case, the lower court decided to award attorney's fees and then, without providing Appellant's counsel an opportunity to address either Appellee's entitlement to fees or the reasonableness of the fee award itself, the circuit court approved an order prepared by Appellee's counsel, which

---

criminal contempt proceedings. *See Robinson,* 166 W.Va. at 662–69, 276 S.E.2d at 814–17.

**39.** In contrast, when the sanction is aimed at an " 'affront to the dignity or authority of the court, or to preserve or restore order in the court or respect for the court, the contempt is criminal.' " *Stephens,* 200 W.Va. at 806, 490 S.E.2d at 895 (quoting Syl. Pt. 4, in part, *Robinson,* 166 W.Va. at 661, 276 S.E.2d at 813).

**40.** The record reveals that the contempt ruling against Appellant's counsel resulted when Appellant, asserting her Fifth Amendment right, refused to answer the trial court's questions despite assurances from the court that no jail term would result from her testimony since this was a civil contempt proceeding and counsel refused to accept the lower court's ruling. Counsel was fined $150 for three initial refusals to "sit down" and then an additional $50 later in the proceeding when counsel kept insisting that he be allowed to read the "Code" into the record. While we recognize the need for zealous advocacy on the part of trial counsel, we also appreciate the need for counsel to respect the temporal finality of the lower court's ruling pending appeal. The transcript from the March 1, 1999, hearing dem-

onstrates conduct that is sufficiently disrespectful to the circuit court to warrant a summary contempt finding. *See* W.Va.Code § 61–5–26; Syl. Pt. 2, *State v. Boyd,* 166 W.Va. 690, 276 S.E.2d 829 (1981). Further evidence of both direct and indirect disrespectfulness is evidenced by the finding in the March 3, 1999, order that Appellant's counsel "has improperly advised his client . . . to disobey the Orders of this Court and in so doing to display blatant disrespect for this Court and its Orders."

**41.** The court further states that Appellant's counsel's "actions have required defendant's attorneys to respond and to schedule hearings and make court appearances in response to said frivolous pleadings."

**42.** This Court held in the syllabus of *Canady* that:

A court may order payment by an attorney to a prevailing party reasonable attorney fees and costs incurred as the result of his or her vexatious, wanton, or oppressive assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of existing law. 175 W.Va. at 250, 332 S.E.2d at 263.

directed that $6080.50 in cumulative fees and costs were to be paid by Appellant's counsel within seven days.

In failing to accord Appellant's counsel an opportunity to respond to the lower court's basis for assessing fees and costs, the most basic of all protections inherent to our judicial system has been violated. Even a cursory reading of Rule 11, which permits sanctions to be awarded against counsel for pleadings that are either not supported in law or fact or are wrongly filed for harassment, cost-enhancement purposes, or to promote delay, demonstrates that a circuit court must still afford the party, whose conduct has spawned the need to consider sanctions, "notice and a reasonable opportunity to respond." W.Va.R.Civ.P.11(c). We observed in *State ex rel. Dodrill v. Egnor*, 198 W.Va. 409, 481 S.E.2d 504 (1996), that "ordinarily a party about to be sanctioned is given an opportunity to explain the default or to argue for a lesser penalty." *Id.* at 414, 481 S.E.2d at 509. The record in this case demonstrates that the lower court merely announced its decision to award attorney's fees and did not permit any argument to be heard on this issue.

■ In syllabus points one and two of *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827 (1996), we addressed the underlying procedural concerns inherent to an award of sanctions:

> Although Rules 11, 16, and 37 of the West Virginia Rules of Civil Procedure do not formally require any particular procedure, before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority. The Due Process Clause of Section 10 of Article III of the West Virginia Constitution requires that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case. Thus, a court must ensure any sanction imposed is fashioned to address the identified harm caused by the party's misconduct.

> In formulating the appropriate sanction, a court shall be guided by equitable principles. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

In rendering its award of attorney's fees, the lower court failed to heed basic due process principles of notice and opportunity to be heard, as well as the foundational relationship concerns discussed in *Bartles.*

■ While we do not question the lower court's authority to subject Appellant's counsel to sanctions in the form of attorney's fees, we cannot approve the summary method by which Judge Irons concluded that attorney's fees were warranted and then permitted Appellee's counsel to submit their fees, without any opportunity for Appellant to challenge the reasonableness of such fees. Before imposing sanctions for filing frivolous pleadings and advancing frivolous arguments, a trial court must give the alleged contemnor notice and an opportunity to be heard on the questions of frivolousness, appropriate sanctions, and, if an award of attorney's fees is to be made, on the necessity and reasonableness of such fees. At the conclusion of such hearing, the trial court must make sufficient findings of fact and conclusions of law to enable the appellate court to conduct a meaningful review. Accordingly, we find that the lower court abused its discretion in imposing the sanction of attorney's fees by not first permitting Appellant's counsel an opportunity to be heard on the issue underlying the trial court's award of sanctions and by not holding a hearing on the reasonableness of the fees. *See Bartles*, 196 W.Va. at 389–90, 472 S.E.2d at 835–36. On remand, the lower court is directed to conduct a hearing for the purpose of permitting Appellant's counsel an opportunity to respond to the circuit court's position regarding the frivolous pleadings

counsel filed between February 9, 1999, and March 1, 1999, and if sanctions in the form of attorney's fees are still deemed appropriate by the lower court, Appellee's counsel should address the reasonableness of the fees submitted and Appellant's counsel should then be provided an opportunity to challenge the submitted fees on the ground of reasonableness.[43] *See* Syl. Pt. 4, *Aetna Cas. & Sur. Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986).

### C. Appeal No. 27318—June 17, 1999, Order

Through this appeal, Appellant asserts error with regard to the lower court's denial of her motions seeking post-ruling relief with regard to the March 3, 1999, contempt ruling and concerning the visitation directives set forth in the February 9, 1999, order. Also challenged is the lower court's finding of contempt against Appellant for violating various orders addressing exercise of Appellee's visitation rights.

As support for her Rule 59(a) motion seeking a new "trial" with regard to the March 3, 1999, contempt ruling, Appellant asserted that she had not been served with the petition for contempt. Dispensing with this "jurisdictional" challenge, the lower court reframed Appellant's concerns as actually involving issues of notice, and concluded that there was no merit to Appellant's averments since her counsel admitted to receiving the contempt petition.[44] The circuit court found additionally that Appellant was not "surprised" by the visitation issues considered in that proceeding. We find no error with regard to the denial of the Rule 59(a) motion. Judge Kirkpatrick also found no merit to Appellant's Rule 60(b)(1) and (b)(6) challenges to the February 9, 1999, order adopting the recommended order of FLM Wiley.[45]

For the same reasons we did not address Appellant's assignments of error pertinent to the February 9, 1999, order, we likewise do not address the denial of motions seeking post-ruling relief from this same order.[46]

Although we find no error with regard to Judge Kirkpatrick's entry of a contempt ruling against Appellant for her admitted failure to comply with the visitation directives set forth in multiple orders,[47] the mechanism set in place "designed to restore the relationship between father and children" in the event that Appellant chooses to prospectively deny visitation requires certain modifications. The June 17, 1999, order provides that:

> Although the court does not anticipate that the plaintiff [Appellant] will now continue to prevent visitation; out of an abundance of precaution and in view of past actions, the undersigned does set forth hereafter a mechanism to be utilized upon failure of the plaintiff to follow the visitation directive. . . .

> So, in the event of a further instance of denial of unsupervised visitation by the plaintiff, the court will invoke the following procedure as a remedial, not punitive, measure designed to restore the relationship between father and children:

> 1. A prompt hearing upon notice will be scheduled in Monroe County before the undersigned to determine whether or not the defendant [Appellee] was enabled to exercise his visitation prescribed herein.

> 2. If it is established that the defendant was further denied his specified visitation by plaintiff, the care, custody and control of these children shall be transferred forthwith from the plaintiff to the defendant.

Recommended Order as emanating from "a strong difference of opinion between the plaintiff and the court" as to the need for supervised visitation.

---

**43.** Appellant claims that the aggregate award of fees is excessive.

**44.** Judge Kirkpatrick's June 17, 1999, order, reflects that Judge Irons noted for the record during the March 1, 1999, hearing that the court file contained a return showing that Appellant was "regularly served" with the contempt pleadings.

**45.** Judge Kirkpatrick distilled all of Appellant's challenges to the lower court's adoption of the

**46.** *See* Section II.B. discussing statutory waiver of exceptions to FLM Recommended Order.

**47.** Those orders were entered on February 9, 24, and 26, 1999.

3. The Sheriff of Monroe County will be directed to retrieve and transport these children to the home of the defendant to effect this custody arrangement.

4. At such hearing, visitation privileges to be afforded to the plaintiff will be determined.

As justification for its four-pronged method of resolving future instances of visitation denial, the lower court cited this Court's decision in *Arbogast v. Arbogast,* 174 W.Va. 498, 327 S.E.2d 675 (1984). Judge Kirkpatrick refers to the following passage from that decision:

The custody change does not appear to have been ordered because of any isolated or technical disregard of the district court's authority, but because Jacquelyn consistently and willfully refused to allow her son any contact with the Arbogast family, denying her son the right to know and share the companionship, affection and society of his father and his parental grandparents. A mother's "very act of preventing . . . children of tender age from seeing and being with their father is an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the mother is unfit to act as custodial parent."

*Id.* at 505, 327 S.E.2d at 682. By focusing solely on the above-quoted language, the lower court obscures the fact that, in *Arbogast,* this Court was enforcing a modification of custody that had already been ordered by a Kansas court. Since our actions in that case were governed by the Parental Kidnaping Prevention Act,[48] *Arbogast* is clearly inapposite. Our decision in that case cannot be read as sanctioning a modification of custody based solely on visitation denial.[49]

Since a change in legal custody can only result pursuant to the statutory procedures set forth in West Virginia Code § 48–2–15(e) (1999), which entail the filing of a motion seeking a change in custody and presume a hearing on such motion, the mechanism included in the June 17, 1999, order wrongly suggests circumvention of the statutorily-required method of obtaining a custody modification.[50] While the order correctly requires a hearing following notice to the parties on the issue of denied visitation, the order continues by directing, in mandatory terms, that legal custody shall forthwith be transferred from Appellant to Appellee upon proof of denied visitation. A modification of child custody, without notice and hearing, cannot be ordered to result concurrently with a prospective instance of forbidden conduct. Certainly, one parent's continued refusal to permit the non-custodial parent to exercise his/her visitation rights could be considered by the court upon a proper motion for a change in custody. A modification in custody cannot result, however, simply by virtue of a visitation denial. Because any modification must result from a petition, followed by a hearing on the evidence and can only be ordered following compliance with the standard established for custody modifications,[51] the lower court erred through its prospective directive that would authorize the sheriff to "retrieve and transport" the parties children as a remedial measure intended to "coerce" Appellant into compliance with the visitation directives already in place.[52] Accordingly, item numbers two, three, and four must be omitted from the list of procedures set in place by Judge Kirkpatrick to address future denials of visitation. Upon deletion of these conditions from the June 17, 1999, contempt ruling, the order is properly sustainable, given Appellant's admissions with regard to the

48. *See* 28 U.S.C. § 1738A (1994).

49. Clearly, a West Virginia court could rely upon continued denial of visitation to modify a previous custody ruling assuming adherence to the appropriate procedures. *See* W.Va.Code § 48–2–15(e).

50. The standard which a circuit court is required to apply in considering motions for modification of custody is a change in circumstances of the

parties since the entry of the original decree plus a demonstration that the change of custody would materially promote the welfare of the child[ren]. *See* Syllabus, *Cunningham v. Cunningham,* 188 W.Va. 235, 423 S.E.2d 638 (1992).

51. *See supra* note 50.

52. Appellee observes that no visitation violations have occurred since this order was signed.

visitation denials which are the subject of the contempt ruling.

Based on the foregoing, the February 9, 1999, order of the Circuit Court of Monroe County is hereby affirmed; the March 3, 1999, order of the Circuit Court of Monroe County is reversed as to the award of attorney's fees and remanded for proceedings consistent with this opinion, but otherwise affirmed; and the June 17, 1999, order of the Circuit Court of Monroe County is reversed as to the mechanism designated for transferring physical and legal custody upon a pro-spective visitation denial and remanded for entry of an order omitting such mechanism, but otherwise affirmed.

Affirmed, in part; Reversed in part; and Remanded With Directions.